Jerry Joe BIRD, Appellant,

v.

The STATE of Texas, Appellee.

No. 50213.

Court of Criminal Appeals of Texas.

Oct. 8, 1975.

Douglas Tinker and Richard Bradshaw, Corpus Christi, for appellant.

Fred Galindo, Dist. Atty., Peter C. Gilman and Joe Hendley, Asst. Dist. Attys., Brownsville, Jim D. Vollers, State's Atty., David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction for the offense of capital murder. The punishment assessed is death.

The sufficiency of the evidence is not challenged. It is not necessary to detail all facts. Jo Ellen Trammell, wife of the deceased, Vic Trammell, a gun collector, testified that on the evening of January 11, 1974, the appellant Bird and his companion, Korges, appeared at the Trammell house and said they had guns to sell. Trammell said he did not desire to purchase any guns but would look at the same. At this point, Bird pulled a pistol with a silencer attached. Subsequently, he gave the weapon to Korges. The Trammells were placed in different rooms, handcuffed, and their feet and eyes were taped. Later, Mrs. Trammell heard shots from the other room and a groan. She slipped one hand out of the handcuffs, untaped herself, and crawled out a window and hid in a drainage ditch. After some time elapsed, she smelled smoke, but did not leave her hiding place until she heard fire engines approaching. The Trammell house was on fire. After the fire was extinguished, Vic Trammell's body, badly burned, was found inside the · house. Among other things, his very valuable gun collection was missing. The doctor who performed the autopsy was unable to say whether Trammell's death was due to the two bullet wounds in his body or resulted from the fire, but theorized that he had been shot first and that such wounds would have been fatal. At the scene a pistol with a silencer was found. The appellant did not testify, but called Kenneth Ross, Special Agent for the United States Treasury, Bureau of Alcohol, Tobacco, and Firearms, who related he had traced the pistol to a gun dealer in Lake Charles, Louisiana, whose records of dates and disposition had been stolen. On cross-examination he expressed the opinion that the silencer was crudely made, perhaps in a machine shop, and was not commercially made.

We are confronted at the outset with the most serious question in the case. Appellant contends the trial court erred in failing to grant a mistrial when the assistant district attorney commented in argument on his failure to testify, in violation of his State and Federal constitutional privilege against self-incrimination and in violation of Article 38.08, Vernon's Ann.C.C.P.

The assistant district attorney in his opening argument at the guilt stage of the trial stated:

"MR. GAVITO: . . . Do you have to be a· J. Edgar Hoover to know the purpose of this thing? Do I have to be a Philadelphia lawyer to tell you what this is and why it is constructed? When they left Corpus Christi, they intended to kill and, that is the only logical conclusion you can draw, because they didn't want the neighbors to hear the shots. And that is another target that the defense can take a potshot at.

Why go through the trouble of manufacturing a silencer? Is it common occurrence? Have you ever done it? This, in itself, is a violation of the law. As his own witness told us, the firearms expert, it takes skill, it takes knowledge to manufacture a thing of this kind. *Jerry Joe Bird is a machinist and well capable of manufacturing such a thing. And if he didn't manufacture it, where did you get it?*

"MR. TINKER: Excuse me. That is certainly a comment on my client's failure to testify. I object to it and I ask that the jury be instructed to disregard it.

"THE COURT: Objection sustained. The jury—

"MR. TINKER: I would like the record to reflect that, as he made that statement, he turned and looked at my client and I ask for a mistrial at this time.

"THE COURT: Mistrial denied. The Court was—

"MR. TINKER: I would like to have an opportunity to make a bill on that.

"THE COURT: You will."

(Emphasis Supplied)

Appellant subsequently developed his informal bill of exception. His attorney, Douglas Tinker, was sworn and testified that during the argument the prosecutor made reference to the silencer and then, in the presence of the jury, turned, leaned over and looked directly at the appellant and stated, " . . . where did you get it?" The prosecution neither at the time of the original objection nor at the time the bill of exception was developed made an effort to dispute or refute the statement of defense counsel or his subsequent testimony. The court did not qualify the informal bill of exception. In fact, the court stated it would make no findings and would let the record speak for itself. The record was subsequently approved without objection. See Article 40.09, Vernon's Ann.C.C.P.

This, then is the record by which this court must test appellant's contention—a record which reflects that defense counsel's statement and testimony as to the prosecutor's argument and physical actions are unchallenged by the State and unqualified by the court. See and cf. *Hicks v. State,* 525 S.W.2d 177 (Tex.Cr.App.1975).

It is basic and fundamental law in this State that the failure of an accused to testify may not be the subject of comment by the prosecution. Such comment is in violation of the privilege against self-incrimination contained in Article I, Sec. 10 of the Texas Constitution, and in express violation of Article 38.08, Vernon's Ann.C.C.P., which provides in part that " . . . the failure of any defendant to so testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause." See also *McDaniel v. State,* 524 S.W.2d 68 (Tex. Cr.App.1975); *Anderson v. State,* 525 S.W.2d 20 (Tex.Cr.App.1975); *Hicks v. State,* 525 S.W.2d 177 (Tex.Cr.App.1975); *Koller v. State,* 518 S.W.2d 373 (Tex.Cr. App.1975); *Cherry v. State,* 507 S.W.2d 549 (Tex.Cr.App.1974); *Watson v. State,* 171 Tex.Cr.R. 526, 352 S.W.2d 120 (1961); *Griggs v. State,* 166 Tex.Cr.R. 56, 311 S.W.2d 418 (1958); *Lee v. State,* 162 Tex. Cr.R. 489, 286 S.W.2d 633 (1956). ·

Further, a comment on an accused's failure to testify also presents a federal constitutional question as the same has been held violative of the self-incrimination clause of the Fifth Amendment, which is made applicable to the States by virtue of the Fourteenth Amendment. See *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d

**894**

106 (1965); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Fontaine v. California,* 390 U.S. 593, 88 S.Ct. 1229, 20 L.Ed.2d 154 (1968).

■ The prohibition against such comment on the accused's failure to testify is mandatory and the adverse effect of any reference to the accused's failure to testify is not generally cured by instruction. *Overstreet v. State,* 470 S.W.2d 653 (Tex.Cr.App. 1971); 56 Tex.Jur.2d, Trial, Secs. 266 and 336; Branch's Ann.P.C., 2d ed., Sec. 395.

■ It is well settled in this State that for the argument or comment to offend against the statute (Article 38.08, supra) the language used must be looked to from the standpoint of the jury, and the implication that the language used had reference to the accused's failure to testify must be a necessary one. It is not sufficient that the language might be construed as an implied or indirect allusion thereto. *Ramos v. State,* 419 S.W.2d 359, 367 (Tex.Cr.App.1967), and cases there cited; *Overstreet v. State, supra; Koller v. State,* 518 S.W.2d 373 (Tex. Cr.App.1975); *McDaniel v. State, supra; Hicks v. State, supra.*

■ The test employed is whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the accused's failure to testify. See *McDaniel v. State, supra; Koller v. State, supra; Chapman v. State,* 504 S.W.2d 912 (Tex.Cr.App.1974). In applying this test, the facts and circumstances of each case must be analyzed to determine whether the language used was of such character. *Overstreet v. State, supra; Ramos v. State, supra.*

*Lee v. State,* 162 Tex.Cr.R. 489, 286 S.W.2d 633 (1956), involved a murder case where the accused was charged with killing her husband. The investigating officer testified that when he arrived on the scene the accused told him she shot her husband but other than her name did not give him any information. During argument, the prosecutor argued:

"What are you hiding Martin (defense counsel)? What are you hiding Barr (defense counsel)? If it was an accident? Why didn't you tell the officers out yonder on November 8th, 1954, it was an accident? And it would have stopped all this trouble here."

In reversing the cause for violation of the statute prohibiting comment on the defendant's failure to testify the court noted that the fact that the allusion or comment was put in indirect language does not obviate the harm.

Only recently in *Hicks v. State,* 525 S.W.2d 177 (Tex.Cr.App.1975), we were confronted with a prosecutor's comment on the defendant's failure to testify. During argument, the prosecutor stated:

"But there is somebody that we haven't heard from in this case. And I think you all know who it is."

The defense counsel then requested the record reflect the prosecutor stood behind the defendant and raised his voice when he made his statement. The majority concluded the record was sufficient to show the prosecutor's action and reversed for the comment on the defendant's failure to testify.

■ The argument was made at the guilt stage of the trial. We cannot, however, close our eyes to the crucial issues submitted to the jury in the determination of penalty. See Article 37.071, Secs. (b)(1), (b)(2), and (b)(3), Vernon's Ann.C.C.P.[1] We

1. Article 37.071, supra, provides that at the penalty stage of the trial the court shall submit the following issues:

"(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

"(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

must conclude that the language used (plus the undisputed physical action established) was of such a character that the jury would naturally and necessarily take it to be a comment on the appellant's failure to testify.

■ The State argues that any error in argument was harmless. It is true that on occasion this court has held that the prosecutor's comment on the defendant's failure to testify was harmless error. See, e. g., *Ramos v. State, supra; Ford v. State,* 477 S.W.2d 27 (Tex.Cr.App.1972); *Armstrong v. State,* 502 S.W.2d 731 (Tex.Cr.App.1973). The test adopted is that of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), where the United States Supreme Court held that before a federal constitutional error can be held harmless it must be determined beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.

■ In the present case the appellant received the most extreme punishment authorized by law—death. The constitutional error in commenting on appellant's failure to testify cannot be said in the setting of this particular case to be so unimportant and insignificant that it may be deemed harmless. We cannot conclude beyond a reasonable doubt that the improper comment did not contribute to the conviction and the penalty assessed. The judgment must be reversed.

In view of our disposition we need not reach the question of whether reversible error occurred when the court reporter inadvertently sent certain exhibits into the jury room which had not been introduced into evidence, some of which contained hearsay evidence prejudicial to the appellant.

Further, in the event of a retrial, we must express our deep concern over appel-

    "(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased."

lant's contention he was denied due process when the trial court refused to grant a mistrial when objections were made and it was called to the court's attention that on repeated occasions television cameramen and news media people were photographing the jurors coming to and from the courtroom and in the courtroom itself.

The appellant made a motion to sequester the jurors, which motion was denied. Early in the trial the appellant called the court's attention to the fact that prior to the convening of the court on that day a television cameraman had entered the courtroom and photographed the jury in the box and made his statement as to what occurred in accordance with Article 40.09, Sec. 6(a), Vernon's Ann.C.C.P. His motion for a mistrial was denied, as well as his renewed motion to sequester the jury and his motion to enter an order to prevent the news media from photographing the jurors. The appellant pointed out to the court that the jurors were aware of the fact that they were being photographed by television cameras and noted the obvious pressure on them even if they followed the court's instructions not to listen to or watch television reports concerning the case.

The record further reflects that on numerous occasions the appellant objected that the news media were photographing the unsequestered jurors in the corridors coming to and from the courtroom. All motions for mistrial were overruled. The record reflects that at least on two other occasions the television cameras photographed the proceedings through the glass windows of the courtroom doors while the court was in session and the jury was in the box. Here again, objections were made and overruled. At the hearing on the motion for new trial the films taken were introduced into evidence and it was established that the films were shown on local television while the trial was in progress.[2]

2. The commentaries accompanying the showing of the film are not in the record before us.

The Texas Code of Judicial Conduct, Canon 3.A(7), provides:

"A judge should prohibit broadcasting, televising, recording, or taking photographs in the courtroom and areas adjacent thereto during sessions of court or recesses between sessions, except that a judge may authorize:

"(a) . . .

"(b) . . .

"(c) . . . ." [3]

The American Bar Association Code of Judicial Conduct is to the same effect.

In *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), the United States Supreme Court in noting the potential impact of television on the jurors stated: "The conscious or unconscious effect that this may have on the juror's judgment cannot be evaluated, but experience indicates that it is not only possible but highly probable that it will have a direct bearing on his vote as to guilt or innocence." Id. at 381 U.S., p. 545, 85 S.Ct., p. 1634. Reversal resulted in *Estes,* although there the jurors were sequestered while in the instant case they were not. See also *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

In *Estes* the court held that isolatable prejudice did not have to be shown to reach a conclusion that Estes was deprived of due process by the televising of his highly publicized criminal trial.

In the event of a retrial the court will surely take steps to remove any basis for this due process question to again be raised.

The judgment is reversed and remanded.

---

**3.** None of these exceptions are here relevant. In fairness, it should be noted that the said Canon 3.A(7) was promulgated by the Supreme Court of Texas, effective September 1, 1974, almost two months after the date of the instant trial. A similar provision in the Code of Judicial Conduct had been approved in September, 1973, by the Judicial Section, State Bar of Texas.